## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

AMANDA MARIE GALLEGOS,

       Plaintiff,

v.                                                                                    Civ. No. 16-264 GJF

NANCY A. BERRYHILL, *Acting
Commissioner of the Social Security
Administration*,

       Defendant.

## <u>ORDER</u>

THIS MATTER is before the Court on Plaintiff's "Motion to Reverse and Remand for Rehearing, With Supporting Memorandum" ("Motion"), filed on October 14, 2016. ECF No. 20. The Commissioner responded on December 19, 2016. ECF No. 21. Plaintiff replied on January 3, 2017. ECF No. 23. Having meticulously reviewed the entire record and the parties' pleadings, the Court finds that Plaintiff's Motion should be **GRANTED IN PART** and **DENIED IN PART**. The Court further **ORDERS** that the instant matter be **REVERSED** and **REMANDED** for the limited reason set forth herein.

## I.    BACKGROUND

Plaintiff was born on January 7, 1972. Administrative R. ("AR") 49. She did not graduate high school, but she did receive her general equivalency degree ("GED"). AR 38. From 1997 to 2010, Plaintiff held semi-continuous employment as a cashier at a dairy facility, change clerk at a casino, and as a home health care provider. AR 33-37. Plaintiff last worked as a home health care provider, but quit the position in 2010 because she "ha[d] a hard time concentrating." AR 33.

1

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on July 27, 2012. AR 132. Plaintiff claimed disability beginning on March 1, 2012, based on diabetes, blurred vision, foot pain, high cholesterol, incontinence, high blood sugar, memory loss, and concentration loss. AR 49. The Social Security Administration ("SSA") denied Plaintiff's application initially on January 14, 2013, and upon reconsideration on May 3, 2013. AR 60, 75. At her request, Plaintiff received a *de novo* hearing before ALJ Barry O'Melinn on March 25, 2014, at which Plaintiff, her attorney, and a vocational expert ("VE") appeared. AR 28-47. On August 29, 2014, the ALJ issued his decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act ("the Act"). AR 11-22. Plaintiff appealed to the SSA Appeals Council, but it declined review on February 26, 2016. AR 1-3. As a consequence, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 422.210(a) (2016).

Plaintiff timely filed her appeal with this Court on April 7, 2016. ECF No. 1.

## II.    PLAINTIFF'S CLAIMS

Plaintiff advances two grounds for relief. First, she argues that the ALJ erred by improperly evaluating her urinary frequency as non-severe at step two and by failing to account for the impairment as part of her residual functional capacity ("RFC") determination at step four. Pl.'s Mot. 7-10, ECF No. 10. Second, she contends the ALJ should be reversed for failing to resolve a conflict between the testimony of the VE and the Dictionary of Occupational Titles at step four. *Id.* at 11-12.

## III.    APPLICABLE LAW

### A.  Standard of Review

When the Appeals Council denies a claimant's request for review, the ALJ's decision

becomes the final decision of the agency.[1]  The Court's review of that final agency decision is both factual and legal.  *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992)) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence.").

The factual findings at the administrative level are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2012).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. Substantial evidence does not, however, require a preponderance of the evidence. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.

As for the review of the ALJ's legal decisions, the Court examines "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax*, 489 F.3d at 1084.  The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show . . . that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

---

[1] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g) (2012), which generally is the ALJ's decision, not the Appeals Council's denial of review.  20 C.F.R. § 404.981 (2017); *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

Ultimately, if substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214, *Doyal*, 331 F.3d at 760.

**B.  Sequential Evaluation Process**

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2017). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App. 1.  If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's RFC. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e), 416.920(e).  In phase two, the ALJ determines the physical and mental demands of the claimant's past relevant work, and in the third phase, compares the claimant's RFC with the functional requirements of his past relevant work to determine if the claimant is still capable of performing his past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f).  If a claimant is not prevented from performing his past work, then he is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

If the claimant cannot return to his past work, then the Commissioner bears the burden at the fifth step of showing that the claimant is nonetheless capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also*

*Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## IV.    THE ALJ'S DECISION

The ALJ issued his decision on August 29, 2014.  AR 8.  At step one, he found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of March 1, 2012.  At step two, the ALJ found Plaintiff's diabetes mellitus, obesity, and depression to be severe impairments.  AR 13.  In contrast, the ALJ found Plaintiff's urinary frequency to be non-severe.  AR 13.

At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 14-16.  The ALJ began with Plaintiff's diabetes mellitus, which the regulations directed the ALJ to assess under applicable listings for other body systems. [2]  AR 14. Thus, the ALJ considered "evidence of diabetic ketoacidosis, chronic hyperglycemia, and

---

[2] Diabetes mellitus is an endocrine disorder.  The SSA evaluates impairments that result from endocrine disorders under the listings for other body systems.  For diabetes mellitus, regulations specifically provide:

> Diabetes mellitus and other pancreatic gland disorders disrupt the production of several hormones, including insulin, that regulate metabolism and digestion. Insulin is essential to the absorption of glucose from the bloodstream into body cells for conversion into cellular energy. The most common pancreatic gland disorder is diabetes mellitus (DM). There are two major types of DM: type 1 and type 2. Both type 1 and type 2 DM are chronic disorders that can have serious disabling complications that meet the duration requirement. Type 1 DM—previously known as "juvenile diabetes" or "insulin-dependent diabetes mellitus" (IDDM)—is an absolute deficiency of insulin production that commonly begins in childhood and continues throughout adulthood. Treatment of type 1 DM always requires lifelong daily insulin. With type 2 DM—previously known as "adult-onset diabetes mellitus" or "non-insulin-dependent diabetes mellitus" (NIDDM)—the body's cells resist the effects of insulin, impairing glucose absorption and metabolism. Treatment of type 2 DM generally requires lifestyle changes, such as increased exercise and dietary modification, and sometimes insulin in addition to other medications. While both type 1 and type 2 DM are usually controlled, some persons do not achieve good control for a variety of reasons including, but not limited to, hypoglycemia unawareness, other disorders that can affect blood glucose levels, inability to manage DM due to a mental disorder, or inadequate treatment.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Part A1, § 9.00(B)(5) (2016).

hypoglycemia in determining whether [Plaintiff's] diabetes me[t] or equal[ed] a listing." AR 14.
In conclusion, he found that "the evidence does not establish that [Plaintiff's] diabetes mellitus
meets or medically equals the criteria of any Listing." AR 14.

Following his examination of Plaintiff's physical impairments, the ALJ considered
whether Plaintiff's mental impairment met the criteria of Listing 12.04 (affective disorders). AR
14. He began by evaluating paragraph B of the Listing and Plaintiff's activities of daily living
("ADLs"). AR 15. There, the ALJ found Plaintiff to have only a mild restriction. Among other
things, the ALJ observed that Plaintiff "cared for herself, [her] three-year-old son, and her
chickens and dog while her husband worked full time as a plumber." AR 15. Additionally, he
noted that Plaintiff "read her son stories, gave him baths, and walked him." AR 15 (citing AR
173-74).

Second, the ALJ found Plaintiff had only mild difficulties with social functioning. The
ALJ cited approvingly to the Third Party Function Report completed by Plaintiff's husband,
wherein he reported that Plaintiff "visited with her mother and sister once a week." AR 15
(citing AR 167). The ALJ found this to accord with Plaintiff's own statement that she "shopped
every day, drove, and participated in a weekly play group with her son." AR 15 (citing AR 176-
77).

Third, the ALJ found that Plaintiff had moderate difficulties with concentration,
persistence, and pace. In support, he cited to Plaintiff's testimony that "she would lose items
such as her money card, her husband's money card[,] and her to do list." AR 15. He also
mentioned Plaintiff's written statements, where she "noted she could pay attention for a few
minutes, did not finish what she started, had to read written instructions over and over again, and
did not follow oral instructions very well." AR 15. Plaintiff also documented that "she did not

do well under stress and did not handle changes in routine at all." AR 15 (citing AR 178-79). These reports corresponded with the findings of the non-examining state consultants, who "opined [Plaintiff] had moderate difficulties in concentration, persistence, and pace." AR 15 (citing AR 56, 72).

The ALJ concluded his paragraph B discussion by finding that Plaintiff "has experienced no episodes of decompensation, which have been of extended duration." AR 15.

Alongside his paragraph B findings, the ALJ also considered whether Plaintiff qualified under the paragraph C criteria. The ALJ answered this inquiry in the negative, finding that "the evidence fails to establish the presence of the 'paragraph C' criteria." AR 15. Specifically, he recalled that Plaintiff "lived with her husband and young son, cared for her chickens and dog, and her husband worked full time." AR 15. "Further," he remarked, "the medical evidence showed minimal evidence of mental health treatment." AR 15.

Because none of Plaintiff's impairments satisfied an applicable Listing, the ALJ moved on to step four and assessed Plaintiff's RFC. AR 16-21. After "careful consideration of the entire record," the ALJ determined that Plaintiff has the residual functional capacity to:

> perform light work as defined in 20 [C.F.R. §] 404.1567(b) except [she] can occasionally climb ramps or stairs, can never climb ladders, ropes or scaffolds, can occasionally balance, stoop, kneel, crouch and crawl, and must avoid concentrated exposure to operational control of moving machinery and heights. Further, [Plaintiff] can understand, remember and carry out simple instructions and make commensurate work-related decisions. Finally, [Plaintiff] can respond appropriately to supervision, co-workers, and work situations, deal with changes in work settings, and maintain concentration, persistence or pace for up to and including two hours at a time throughout a workday with normal breaks.

AR 16.

To develop Plaintiff's RFC, the ALJ relied on four separate grounds. First, the ALJ rendered an adverse credibility finding against Plaintiff, opining that Plaintiff's "statements

concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely credible." AR 21. To support his finding, the ALJ contrasted Plaintiff's contention "that she is disabled because of her memory problems" with medical reports showing Plaintiff had "forgot[ten] to take her medicine," and generally, was in poor compliance with her medicine regimen. AR 21. The ALJ found it "significant" that Plaintiff "explained she was 'too busy' to take her medicine[ ]." AR 21 (citing AR 341). The ALJ similarly highlighted the contradiction between Plaintiff's report of "significant memory problems" and her self-reported ability "to care for her young son and her animals[,] which included 'a few' chickens and a dog." AR 21. Moving to Plaintiff's physical impairments, the ALJ found "no objective evidence" of Plaintiff's "increased urinary frequency." AR 21. "While she did report this problem," the ALJ observed that "there was no medical reason or cause for the increased urinary frequency." AR 21. He concluded that if Plaintiff's "conditions were as limiting as she claimed, she would have had more consistent medical treatment that would have objectively supported the alleged [limitation]." AR 21.

The ALJ derived additional support from his consideration of the Third Party Function report completed by Plaintiff's husband, Daniel V. Gallegos. AR 20-21 (citing AR 162-70). Mr. Gallegos asserted that Plaintiff could not focus on certain tasks and that her mind was in different places. AR 20. The ALJ discounted this opinion, observing *inter alia* that Mr. Gallegos "works full time and thus is unable to observe [Plaintiff] when he works," and that his report is "inconsistent with the objective evidence of record." AR 20-21. As a consequence, the ALJ accorded "little weight to the opinion of Mr. Gallegos," finding that his "report is unpersuasive and does not credibly support that [Plaintiff] is disabled." AR 20-21.

Third, the ALJ relied on the medical evidence of record.  To begin, the ALJ accorded "little weight" to the opinions of the non-examining agency consultants who assessed Plaintiff's physical impairments.  AR 18-19.  These two doctors – Dr. Ronald Crow, D.O. and Dr. Stephen A. Whaley – both opined that Plaintiff's diabetes was a non-severe impairment.  AR 18 (citing AR 54-55, 68).  The ALJ took exception with these opinions, finding instead that the "hearing level evidence" supports the fact that Plaintiff's diabetes "is a severe impairment as opposed to a non-severe impairment."  AR 19.

The ALJ also assigned little weight to the opinion of Dr. Raul Young-Rodriguez, M.D., the consultative examiner who assessed Plaintiff's physical limitations in December 2012.  AR 19.  Following his examination of Plaintiff, Dr. Young-Rodriguez concluded that "there was no clinical evidence to support a limitation of [Plaintiff's] activity."  AR 19.  The ALJ discounted this opinion, finding that "Dr. Young-Rodriguez'[s] opinion that there was no evidence to support a limitation of activity is inconsistent with the objective findings."  AR 19.  As an example, the ALJ highlighted Dr. Young-Rodriguez's observation that Plaintiff "could stand at one time for 20 minutes and stand for two hours out of an eight-hour period."  AR 19.  In the ALJ's opinion, that restriction "by itself supports physical limitations."  AR 19.  The ALJ made similar citations to other portions of Dr. Young-Rodriguez's opinion, and ultimately concluded that his "findings are inconsistent with the opinion of no limitations."  AR 19.

The ALJ completely discounted the opinion of consultative examiner Dr. Finian J. Murphy, Ed.D.  Dr. Murphy examined Plaintiff in December 2012 and initially opined that Plaintiff's "activities of daily living were within the normal range, she was oriented in all spheres[,] and had average intelligence."  AR 20.  But, while he believed Plaintiff's "ability to understand instructions was within the normal range," he also found that "her ability to carry out

instructions, concentrate and persist at tasks was markedly limited by her psychological and medical problems." AR 20. Furthermore, he assessed Plaintiff with the exceptionally low Global Assessment of Functioning ("GAF")[3] score of 31. The ALJ found Dr. Murphy's opinion "internally inconsistent" and concluded that Dr. Murphy's "examination findings do not support the extremely low GAF assessment." AR 20. Moreover, the ALJ found that the opinion "is not consistent with the objective evidence of record." AR 20. As a result, the ALJ gave "no weight" to the opinion.

The ALJ closed his consideration of medical opinions by evaluating the submissions of the two non-examining agency psychologists, Dr. Suzanne Castro and Dr. Cheryl Woodson-Johnson, Psy.D. He reviewed each of their findings in detail, including the numerous mental limitations they endorsed.[4] AR 19-20. Ultimately, he accorded "moderate weight" to their opinions, finding that "[t]hey are mostly consistent with the objective evidence." AR 20. The ALJ cautioned however, that "the evidence of record does not support the opinion that [Plaintiff] cannot work in a fast-paced environment or have strict production quotas." AR 20. Based on the ALJ's review of the evidence, he reasoned that "[t]here is no credible indication [that Plaintiff's] psychological condition has ever affected [Plaintiff's] ability to work, nor is there credible evidence her condition worsened since she stopped working." AR 20.

---

[3] The Global Assessment of Functioning test is "widely used for scoring the severity of illness in psychiatry." *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2880316/#B14 (last visited July 18, 2017). A GAF score of 31 indicates:

> Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

*See* https://msu.edu/course/sw/840/stocks/pack/axisv.pdf (last visited July 18, 2017).

[4] Plaintiff's appeal challenges only the ALJ's findings on exertional limitations. Thus, the Court has omitted a detailed discussed of the nonexertional limitations recommended by these psychologists.

Along with the preceding three bases, the ALJ completed his RFC determination by assessing Plaintiff's obesity under Social Security Ruling ("SSR") 02-01p.[5]  *See* SSR 02-01p, 2002 WL 34686281 (Sep. 12, 2002).  "In the instant matter," he explained, Plaintiff's obesity "does not indicate any limits when standing alone."  AR 21.  "However," he reasoned, "when taken in combination with the other impairments, it counsels in favor of the postural and exertional limits indicated herein."  AR 21.

In the second phase of step four, the ALJ discussed the testimony of VE Leslie White, who testified at Plaintiff's administrative hearing that Plaintiff had past relevant work as a home health care provider, DOT # 354.377-014, and as a cashier, DOT # 211.462-010.  AR 21.  VE White further testified that Plaintiff's past relevant work as a cashier had a specific vocational

---

[5]  SSR 02-01p provides the following guidance to ALJs as they assess the effects of obesity on a claimant's residual functional capacity:

> Obesity can cause limitation of function.  The functions likely to be limited depend on many factors, including where the excess weight is carried.  An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching.  The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers.  The ability to tolerate extreme heat, humidity, or hazards may also be affected.

> The effects of obesity may not be obvious.  For example, some people with obesity also have sleep apnea.  This can lead to drowsiness and lack of mental clarity during the day. Obesity may also affect an individual's social functioning.

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time.  As explained in SSR 96-8p [ ], our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.   In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.  This may be particularly true in cases involving sleep apnea.

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

SSR 02-01p, 2002 WL 34686281, at *6 (Sep. 12, 2002).

preparation ("SVP") level of two and a light exertion level.  AR 45.  Then, when asked by the ALJ whether she could identify jobs that could be performed by an individual with Plaintiff's vocational profile (age, education, and work experience) who was assigned the limitations contained in Plaintiff's RFC, the VE testified that such an individual could perform Plaintiff's past work as a cashier.  AR 45.  Based on the testimony of VE White, the ALJ concluded in the third phase of step four that Plaintiff could return to her past relevant work as a cashier.  Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined by the Act, during the relevant time period and denied her claim.  AR 22.

## V.     ANALYSIS

Plaintiff advances two allegations of error.  The first of these is easily dismissed, as it is little more than a veiled attempt to induce this Court to reweigh the evidence.  The second claim, however, contains multiple bases for reversing the ALJ's ruling and remanding this matter for the limited purposes identified herein.  The Court's reasoning follows below.

### A.  The ALJ Properly Evaluated Plaintiff's Urinary Frequency

Plaintiff begins her appeal by claiming "the ALJ erred by failing to find urinary stress/incontinence to be a severe impairment" at step two.  Pl.'s Mot. 7.  While she acknowledges that the ALJ "found other impairments to be severe," and thus, "proceeded past step two," she nevertheless advances the additional argument that the ALJ also "erred at step four" by failing to consider her urinary frequency as part of the RFC determination.  *Id.* at 9.

Plaintiff questions the ALJ's process in several ways.  Generally, she argues that there is "substantial evidence of record" to demonstrate that her "urinary frequency/stress incontinence is a severe impairment" at step two, and that the same evidence, considered at step four, proves that her "urinary frequency has more than a minimal effect on her ability to perform basic work

activities." *Id.* at 7, 8 (citations omitted).   Additionally, she attempts to weaken the ALJ's rationale by locating inconsistencies in his logic.   In one novel example, she asserts the following:

> The ALJ stated that there was no objective evidence of her alleged increased urinary frequency and no medical reason or cause for this condition, and if [it] were as limiting as [Plaintiff] claimed she would have had more consistent treatment. The ALJ's reasoning is contradictory to his earlier finding of non-severity. If the ALJ found no objective evidence for her urinary frequency, then he should have found it not to be a medically determinable impairment.

Pl.'s Mot. 10 (internal citations omitted).   Plaintiff propounds similar arguments for each ground supporting the ALJ's finding, and concludes by asserting that "[t]he ALJ's omission of any limitation regarding [Plaintiff's] urinary frequency was legal error requiring reversal and remand." *Id.*

The Commissioner responds that "the ALJ fully evaluated Plaintiff's subjective complaints relating to her urinary frequency, and his RFC finding is supported by substantial evidence."   Def.'s Resp. 4, ECF No. 22.   In support, she explains that "[t]he ALJ found that Plaintiff did not pursue regular treatment for her urinary problems, and substantial evidence supports that finding." *Id.* at 5.   The Commissioner further cites to the record, which reveals that Plaintiff was not compliant with her diabetes treatment, did not keep a lab appointment, did not follow up with a referral to a gynecologist for evaluation of her urinary problems, and only began taking medication for the urinary frequency "a few weeks before the administrative hearing." *Id.*   Citing to Tenth Circuit precedent, the Commissioner contends it "was reasonable and appropriate for the ALJ to consider this evidence when assessing the extent to which Plaintiff's urinary frequency impacted her ability to work." *Id.* (citing *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000); *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988)). Furthermore, the Commissioner cites to *Cowan v. Astrue*, 552 F.3d 1182, 1191 (10th Cir. 2008)

for the proposition that "[t]he ALJ properly considered the fact that Plaintiff worked for years despite urinary frequency."  Def.'s Resp. 5.  Taken together, the Commissioner believes "[t]he ALJ properly evaluated the evidence on this issue and provided reasons for his findings, and his RFC finding is supported by substantial evidence."  *Id.* at 6.

On this issue, the Commissioner prevails.  Despite Plaintiff's attempts to the contrary, neither prong of her argument persuades this Court.  In fact, both are foreclosed by extant case law.  As to the former – Plaintiff's assertion that the ALJ erred at step two by not finding her urinary frequency severe – there is simply no plausible basis to propound the argument.

To proceed past step two, it is well established that an ALJ need only find one severe impairment.  *See Oldham v. Astrue*, 509 F.3d 1254, 1256-67 (10th Cir. 2007).  Plaintiff recognizes "that the ALJ found other impairments to be severe . . . [and] proceeded past step two," but ignores the preclusive effect that doing so had on her ability to claim step two error.  The Tenth Circuit discussed this bar in *Allman v. Colvin*, where the court observed that "[a]s long as the ALJ finds one severe impairment, the ALJ may not deny benefits at step two but must proceed to the next step."  813 F.3d 1326, 1330 (10th Cir. 2016).  "Thus," the court reasoned, "the failure to find a particular impairment severe at step two is not reversible error when the ALJ finds at least one other impairment is severe."  *Id.*  In *Allman*, the ALJ found six other impairments to be severe and the court correspondingly held on appeal that the claimant's step two argument "fail[ed] as a matter of law."  *Id.*  Here, the ALJ found three other impairments severe, and Plaintiff's step two allegation of error must similarly fail as a matter of law.

Plaintiff's step four allegation fares no better than the former, for it is an impermissible one.  In its title, Plaintiff avers that the ALJ "compounded [his step two error] by failing to

evaluate all impairments, including both severe and non-severe at step four." Pl.'s Mot. 7. Yet, upon review, the assertion proves transparently false. At step four, the ALJ exhaustively evaluated Plaintiff's impairments,[6] including the urinary frequency which forms the basis of her step four claim. The ALJ reviewed Plaintiff's account of her symptoms and weighed that account alongside statements by her husband and the opinions of medical professionals. AR 17-20. While Plaintiff did report the condition, the ALJ accurately noted that "there was no medical reason or cause for the increased urinary frequency," and that "[i]f her conditions were as limiting as she claimed, she would have more consistent medical treatment that would have objectively supported the alleged limitations." AR 21. Ultimately, the ALJ considered the record and found that "there was no objective evidence" of Plaintiff's urinary frequency. AR 21.

---

[6] The ALJ examined Plaintiff's claims of urinary frequency *in detail*. The following represents only a fractional sampling of that review:

> The claimant testified she could not remember things, had a short attention span, went to the restroom very frequently, had feet pain, and had concentration issues for which she took Celexa. The claimant testified she had been to the doctor two weeks prior to the hearing and her Celexa dosage had been increased, but she had not yet gotten the new prescription. The claimant asserted she went to the bathroom more than 20 times a day and had gotten medicine for this problem four weeks prior to the hearing, but she maintained the medicine had not helped. She claimed she had the restroom problem for years and had not tried any other remedies before her recently prescribed medicine. The claimant asserted her clients had complained about how much she used the restroom. She testified that one time one of her clients from Heritage had requested a different caregiver in either 2008 or in 2010 and did not know why the client requested a different caregiver.

> …

> She also claimed the doctor referred her to the gynecologist for her urinary problems. In a two hour time period, the claimant claimed she went to the bathroom at least five or six times, had to go to the bathroom when she was out shopping or at appointments, wore protection all the time, and a bladder check after her son was born revealed no bladder problems. The claimant testified she preferred not to participate in social activities. The claimant testified she could not sit through a movie without needing to go to the bathroom, she worried about urinating on herself, and felt like people judged her. Finally, she claimed she had to use the bathroom ten times a night, it interrupted her sleep and this made her tired during the day.

AR 17 (internal quotation marks omitted).

Clearly, the ALJ evaluated Plaintiff's urinary frequency at step four. In fact, he thoroughly did so. It seems clear to the Court, therefore, that Plaintiff's dispute is not actually that the ALJ did not evaluate both Plaintiff's severe and non-severe impairments at step four, but rather, that the ALJ did not evaluate the impairments *in Plaintiff's favor*. And, because the ALJ did not do so, Plaintiff now invites this Court to usurp the administrative responsibilities of the executive and weigh the evidence *de novo* on appeal. The Court must refuse the invitation, as it is forbidden from doing so. *See Qualls*, 206 F. 3d at 1371. Instead, the Court finds that substantial evidence supports the ALJ's RFC determination, as it is supported by the ALJ's thorough analysis, by Plaintiff's adverse credibility finding, by the objective medical evidence of record, and by the medical opinions of *every single doctor* who opined on Plaintiff's exertional limitations. Therefore, the Court will deny Plaintiff's first allegation of error, and order that it not be reconsidered on remand.

**B.    The ALJ Committed Legal Error at Step Four**

Plaintiff next asserts that that ALJ failed to resolve a conflict between the Dictionary of Occupational Titles ("DOT") and the VE's testimony at step four. Pl.'s Mot. 11. During the third (and final) phase of the step four inquiry, the ALJ asked the VE the following:

> So if we have a person of the claimant's age, education and work experience, who can do work at the light exertional level as that term is defined. Such a person may occasionally climb ramps or stairs. Never climb ladders, ropes or scaffolds. Such a person may occasionally balance, stoop, kneel, crouch and crawl. Such a person should avoid concentrated exposure to operational control of moving machinery, unprotected heights and hazardous machinery. *Such a person can understand, carry out and remember simple instructions, and make commensurate work-related decisions.* Respond appropriately to supervision, coworkers and work situations. Deal with routine changes in work setting. Maintain concentration, persistence and pace for up to and including two hours at a time with normal breaks throughout a normal workday. Could such a person do any of claimant's past work?

*Id.* (quoting AR 45) (emphasis added).  The VE responded in the affirmative, and related that Plaintiff should be able to return to her past relevant work as a cashier, as that position conformed to the exertional and skill levels contained in the ALJ's hypothetical RFC.  *Id.* (citing AR 45).

Plaintiff alleges that this recommendation was in error.  She argues that the abilities required by the cashier position "as it is described in the [DOT] do not match the abilities in the ALJ's hypothetical."  *Id.*  Plaintiff explains that the job of cashier II, DOT # 211.462-010, "requires a reasoning level of 3, which the Tenth Circuit has found inconsistent with a limitation to simple work."  *Id.* (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005)).  Plaintiff further contends that, when a claimant is limited to simple work, the *Hackett* case requires the ALJ to "address a claimant's ability to perform work at a reasoning level 3 in a factually specific manner."  *Id.* (citing *Hackett*, 385 F. 3d at 1176).  Plaintiff concludes by stating "[t]he ALJ erred by failing to investigate and resolve this inconsistency."  *Id.* at 12 (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)).

The Commissioner responds circuitously to Plaintiff's contention.  Notably, she never overtly concedes a conflict between the VE's recommendation and the DOT.  Rather, the Commissioner focuses her efforts on shoring up her interpretation of SSR 00-4p, which she believes only requires an ALJ to resolve "any *apparent* conflict."  Def.'s Resp. 6 (emphasis in original).  Toward that end, the Commissioner questions "why or how the ALJ should have been aware of [the *Hackett* case] or how its holding made the alleged inconsistency 'apparent' to the ALJ at the hearing."  *Id.* at 7.  She also directs blame at Plaintiff, noting that the discrepancy Plaintiff now asserts in her Motion was one that she "**did not** assert at the hearing."  *Id.* at 6 (emphasis in original).  The Commissioner then cites to the unpublished decision in *Segovia* for

the notion that "the ALJ is not under an obligation to seek out any and all possible conflicts between the DOT and the vocational expert's testimony before relying on that testimony in his decision." *Id.* (citing *Segovia v. Astrue*, 226 F. App'x 801, 804 (10th Cir. 2007) (unpublished)). By the Commissioner's reading of relevant regulations, "the ALJ fully complied with the requirements of SSR 00-4p, and Plaintiff's argument is without merit." *Id.*

The Commissioner closes by questioning the holding in *Hackett*. She acknowledges the *Hackett* court's observation "that a mental RFC limitation to 'simple and routine tasks' seemed inconsistent with GED[7] reasoning level three, and appeared more consistent with GED reasoning level two." *Id.* at 7 (citing *Hackett*, 395 F.3d at 1176). But, based on her reading of the DOT, the Commissioner argues that "GED reasoning levels equate to educational attainment, not the simplicity or complexity of an occupation." *Id.* (citing DICOT, App'x C, 1991 WL 688702). Therefore, she directs the Court to two unpublished cases which she believes evince a "split of authority" on "whether (and how) GED reasoning levels are related to the mental requirements

---

[7] The DOT uses the acronym GED to refer to General Educational Development, which it describes as follows:

> General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.
>
> The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.
>
> However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years. Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.

DICOT, App'x C, 1991 WL 688702.

of a job." *Id.* at 7-8 (citing *Anderson v. Colvin*, 514 F. App'x 756, 764 (10th Cir. 2013) (unpublished); *Mounts v. Astrue*, 479 F. App'x 860, 868 (10th Cir. 2012) (unpublished)). The Commissioner maintains that the district court cases which have relied on these unpublished decisions "are the better-reasoned line of authority." *Id.* at 8 (citing *Pacheco v. Colvin*, 83 F. Supp. 3d 1157, 1159 (D. Colo. 2015); *Owen v. Colvin*, No. 1:13-CV-00141, 2015 WL 1490947, at *5 (D. Utah Mar. 30, 2015) (unpublished); *Herriage v. Colvin*, No. 14-1345, 2015 WL 5472496, at *2 (D. Kan. Sept. 16, 2015) (unpublished); *Pacheco v. Colvin*, No. 2:13-CV-197 DN, 2014 WL 869294, at *7 (D. Utah Mar. 5, 2014) (unpublished)). These cases, alongside her preceding argument, lead the Commissioner to conclude "there was no 'apparent' conflict between the vocational expert's testimony and the DOT at the time of the hearing, and Plaintiff has further failed to conclusively establish there is any conflict at all." *Id.*

### 1.    SSR 00-4p

In making disability determinations, the SSA relies "primarily on the DOT" at steps four and five of the sequential evaluation process. SSR 00-4p, 2000 WL 1898704, at *2. Nonetheless, ALJs may also use VEs "at these steps to resolve complex vocational issues." *Id.* Occupational evidence provided by a VE "generally should be consistent with the occupational information supplied by the DOT." *Id.* "When there is an apparent unresolved conflict between VE [ ] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE [ ] evidence to support a determination or decision about whether the claimant is disabled." *Id.* "Neither the DOT nor the VE [ ] evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE [ ] is reasonable and provides a basis for relying on the VE [ ] testimony rather than on the DOT information." *Id.*

Where an ALJ takes testimony from a VE, the ALJ assumes two affirmative responsibilities. First, in all cases where a VE provides evidence about the requirements of a job or occupation, the ALJ is commanded by SSR 00-4p to "[a]sk the VE [ ]  if the evidence he or she has provided conflicts with information provided in the DOT." *Id.* at *4. Then, in those cases where the VE's testimony appears to conflict with the DOT, the ALJ must "obtain a reasonable explanation for the apparent conflict." *Id.* Should such a conflict arise, an ALJ "must resolve the conflict before relying on the VE" testimony to support a disability determination. *Id.* Furthermore, the ALJ must explain how the conflict was resolved, "irrespective of how the conflict was identified." *Id.*

### 2.    *Hackett v. Barnett*

In *Hackett*, the Tenth Circuit was asked to decide whether a limitation to simple and routine tasks precluded a claimant from working in a position requiring reasoning level three. There, the claimant's RFC provided that "[m]entally, [the claimant] retains the attention, concentration, persistence and pace levels required for *simple and routine tasks*." *See Hackett*, 395 F.3d at 1176. (citation omitted) (emphasis added). Based on that RFC, a VE at the claimant's administrative hearing had testified that she could work as both a call-out operator and a surveillance-system monitor. *Id.* The claimant argued, however, that "her RFC, as found by the ALJ, [was] incompatible with jobs requiring a reasoning level of three." *Id.*

To decide the issue, the *Hackett* court looked to the plain language of the DOT. The DOT defines reasoning level three as the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form[, and d]eal with problems involving several concrete variables in or from standardized situations." *Id.* (citing DICOT, App'x C, 1991 WL 688702). The *Hackett* court then compared that definition with GED

reasoning level two, which requires a worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* (citing DICOT, App'x C, 1991 WL 688702). By comparing the two levels, the court determined that Plaintiff's limitation to "simple and routine tasks . . . seems inconsistent with the demands of level-three reasoning." *Id.* (citation omitted). Rather, they opined, "level-two reasoning appears more consistent with Plaintiff's RFC." *Id.*

### 3.    The ALJ committed legal error by neglecting his affirmative duty

Closer inspection of Plaintiff's claim reveals two separate grounds necessitating remand. The first derives from SSR 00-4p, which imposes upon ALJs "an affirmative responsibility to ask . . . the VE if the evidence he or she has provided conflicts with information provided in the DOT." SR 00-4p, 2000 WL 1898704, at *4. Here, the ALJ conspicuously neglected to do so.

The ALJ's failure was reinforced by his written decision, where, rather than inserting the step four/five boilerplate language that "pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles,"[8] the ALJ chose instead to state: "[i]n accordance with Social Security Ruling (SSR) 00-4p, the undersigned accepts the testimony of the vocational expert that the cashier position is light, unskilled, and does not exceed the residual functional capacity." AR 22. This choice of words did not go unnoticed by this Court. It should not have gone unnoticed by the Commissioner. And yet, somehow, it did. Indeed, one can imagine this Court's surprise when it reviewed this statement by the Commissioner:

---

[8] Although the Court cannot cite to sealed records from other social security appeals, it can relate that this is the boilerplate language routinely inserted by SSA adjudicators to communicate their compliance with the affirmative duty imposed on them by SSR 00-4p.

> The vocational expert testified that such an individual could perform Plaintiff's past work as a cashier. *The vocational expert affirmed that his testimony was consistent with the information in the Dictionary of Occupational Titles (DOT),* and Plaintiff's attorney did not question the vocational expert about the consistency of the vocational expert's testimony and the DOT.

Def.'s Resp. 2-3 (emphasis added). The vocational expert did *no such thing*, and the ALJ propounded no such question. [9]

The ALJ neglected his affirmative duty under SSR 00-4p to ensure consistency between the VE's testimony and the DOT. This represents reversible error and necessitates remand.

### 4.    *Hackett* counsels remand

Additionally, this Court must remand the instant matter because it is not apparent from the record or the parties' briefing that Plaintiff has the ability to work as a cashier II under her present RFC. The undersigned recognizes that the *Hackett* court's language was not mandatory, and moreover, that the language is dicta. *See Hackett*, 395 F.3d at 1176 (noting that the limitation to simple and routine tasks seems inconsistent with the demands of level-three reasoning). Nevertheless, the same logic that persuaded the *Hackett* court persuades this Court.

In the instant cause, the relevant portion of Plaintiff's RFC states that "[s]uch a person can understand, carry out and remember simple instructions, and make commensurate work-related decisions." AR 45. This, just as in *Hackett*, seems facially incompatible with a GED reasoning level 3 position where a worker must "[a]pply commonsense understanding to carry out *instructions furnished in written, oral, or diagrammatic form*" and "[d]eal with problems involving *several concrete variables* in or from standardized situations." DICOT, App'x C, 1991 WL 688702. To the contrary (but just as in *Hackett*), Plaintiff's RFC limitation more

---

[9] This Court assumes that counsel for the Commissioner simply overlooked these facts or inadvertently inserted boilerplate language from a prior response in another case. In the future, counsel are encouraged to adapt their arguments to the peculiar facts of each case. It is enough to say that a repeat performance of this error will meet with the Court's disfavor.

closely aligns with reasoning level 2, where a worker need only "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and "deal with problems involving a few concrete variables in or from standardized situations." *Id.*

### 5. The Commissioner's arguments are unpersuasive

The Commissioner's arguments to the contrary are unavailing. First, the Court rejects her remarkable proposition that ALJs should not be charged with knowledge of published Tenth Circuit case law that governs the legal review of their decisions. The Commissioner tellingly cites no authority in support of this position. Would the Commissioner also excuse an ALJ's ignorance of the "pick and choose" rule, which is itself a creature of judicial creation? *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability.").

Next, the Court must also reject the Commissioner's intimation that the Plaintiff somehow foreclosed her ability to raise her step four issue because she failed to do so before the ALJ. This notion ignores the U.S. Supreme Court's holding in *Sims v. Apfel*, where the Court discussed the nonadversarial nature of social security proceedings and dismissed the idea of issue exhaustion as "inappropriate" in that setting. *See* 530 U.S. 103, 112 (2000).

Finally, the Commissioner's focus on apparent – as opposed to actual – conflicts is the quintessential red herring. The focus on "apparent conflict" distracts from the central purpose of SSR 00-4p: to require ALJs to identify conflicts – thereby making them appear, or become "apparent conflicts" - by "[a]sking the VE [ ] if the evidence he or she has provided conflicts with information provided in the DOT." *See* SSR 00-4p, 2000 WL 1898704, at *4. Then, "If the [VE's] evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable

explanation for the apparent conflict." *Id.*  In the instant matter, the ALJ neglected his duty to confirm that the VE's testimony conformed to the DOT, thereby eliminating the simplest method of perceiving an apparent conflict between her testimony and the DOT.  The Commissioner's deflection fails to obscure the ALJ's obvious error.

## VI.    CONCLUSION

Based on the above, this Court will follow the guidance of *Hackett* and reverse and remand "to allow the ALJ to address the apparent conflict between Plaintiff's inability to perform more than simple and repetitive tasks and the level-three reasoning required by the jobs identified as appropriate for her by the VE." *Hackett*, 395 F.3d at 1176.  On remand, the ALJ shall ensure that:

(1) the affirmative duty imposed by SSR 00-4p to ensure consistency between the VE's testimony and the DOT is observed;

(2) a fact-specific inquiry is undertaken to determine if Plaintiff can in fact perform her past relevant work as a cashier II, notwithstanding its GED reasoning level of 3, and

(3) if Plaintiff is restricted by virtue of her RFC to employment requiring a reasoning level of 3, a proper step-five inquiry is undertaken.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum [ECF No. 20] is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that the Commissioner's final decision is **REVERSED** and **REMANDED** for further administrative proceedings.

**IT IS SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*